931 So.2d 644 (2006)
Jewel L. BOWMAN, Appellant
v.
CSX TRANSPORTATION, INC. and The City of Pascagoula, a Mississippi Municipality, Appellees.
No. 2004-CA-02383-COA.
Court of Appeals of Mississippi.
May 30, 2006.
*647 Elmer L. Fondren, Jackye C. Bertucci, for appellant.
Matthew Philip Lachaussee, Raymond L. Brown, Patrick R. Buchanan, Pascagoula, John B. Edwards, for appellees.
Before MYERS, P.J., SOUTHWICK and BARNES, JJ.
*648 SOUTHWICK, J., for the Court.
¶ 1. Jewel Bowman brought suit for injuries resulting from a collision with a train at a railroad crossing near Highway 90 in Pascagoula. A jury reached a verdict in favor of defendant CSX Transportation, Inc. The trial judge denied her claims against the City of Pascagoula. On appeal, Bowman alleges multiple errors regarding the admission and exclusion of evidence, the jury instructions, and the denial of post-trial motions. We find no error and affirm.

FACTS
¶ 2. In February 2003, at approximately 5:30 p.m., Bowman was driving her pick-up truck north along Hospital Road in Pascagoula. When she reached the crossing of Hospital Road over the CSX railroad tracks, Bowman came to a stop. Approximately seventy feet beyond the railroad crossing was a traffic light that controlled the intersection of Highway 90 and Hospital Road. When the traffic light turned green, vehicles in front of Bowman began to move until finally the car immediately in front of her pulled forward. Bowman moved forward as well towards her planned right turn onto Highway 90. She testified that she stopped near the tracks, looked both ways, then began to proceed across. However, the vehicle in front of her stopped before she got over the railroad, blocking her on the crossing. While at this spot, Bowman testified that she became aware of a train coming towards her from the right. Blocked from the front by the next vehicle, Bowman drove sharply to her right to get around. That maneuver apparently caused her right front wheel to leave the pavement and for the front of the vehicle to drop down. The bottom of her truck became stuck on the edge of the pavement since the layer of asphalt was so thick that the right front wheel was suspended in the air above the dirt next to the pavement. The truck was immobilized.
¶ 3. Bowman remained in the truck as the train struck her vehicle twice, first in the right rear, and again when the cab of her vehicle hit the train because the first impact spun the vehicle around. Bowman suffered physical injuries and the total loss of her truck.
¶ 4. Bowman brought suit against the City of Pascagoula and CSX. She alleged that her front right tire fell into a "pothole" that was the result of the City's negligence in maintaining the street. Bowman alleged that CSX had been negligent in designing and then maintaining the crossing, and failed to begin braking its train at a reasonable time.
¶ 5. A five-day trial was held in October 2004. Since the City of Pascagoula is subject to the Mississippi Tort Claims Act, the trial court judge served as fact-finder for those claims. He ruled in favor of the City. The jury returned a verdict, by a 10-2 vote, in favor of CSX. After denial of the usual post-trial motions, Bowman appealed. The Supreme Court deflected her case here.

DISCUSSION
¶ 6. Bowman alleges eleven points of error. We combine the first and last in our discussion.

ISSUE 1: Weight of evidence contrary to jury verdict and to court's findings of fact
¶ 7. Bowman alleges that the jury verdict and the trial court's findings were in opposition to vast evidence in her favor. The weight of the evidence will not be found overwhelmingly contrary to a jury verdict unless we are convinced that an unconscionable injustice has occurred. Patterson v. Liberty Associates, L.P., 910 *649 So.2d 1014, 1018 (Miss.2004). Similarly, a trial judge sitting as a trier of fact is entitled to be affirmed on fact-findings unless the findings are clearly erroneous. Rice Researchers, Inc. v. Hiter, 512 So.2d 1259, 1264 (Miss.1987).
¶ 8. Bowman finds support for reversal in a precedent regarding a similar event. Mobile & O.R. Co. v. Bennett, 127 Miss. 413, 90 So. 113 (1921). Bennett also involved a personal injury stemming from a car and train collision at a railroad crossing. The Supreme Court reversed a jury verdict for the plaintiff based on the weight of evidence. The Court found the jury verdict to be counter to the testimony of eyewitnesses who each testified that the driver of the car had been sufficiently warned about the oncoming train. Id., 90 So. at 113.
¶ 9. In Bennett, eight witnesses contradicted the plaintiff's claim that he was not adequately warned about the oncoming train. Witnesses testified that he proceeded through a railroad crossing after the flagman waived a flag and rang a bell. Other individuals were shown to have made obvious attempts to warn him that a train was coming. No evidence was offered to impeach these eight witnesses, whose testimony went directly to the issue of the plaintiff's contributory negligence. Id.
¶ 10. Bowman pointedly refers to eight witnesses at her trial whose testimony she finds to support the defendants' negligence in allowing what she alleges was a "pothole" to remain. These eight witnesses, as well as the photographs of the area in controversy, Bowman believes provided the requisite overwhelming weight of evidence sufficient to reverse the jury's verdict.
¶ 11. We summarize the testimony of the significant witnesses. Tommy Barlow, a city employee at the time of the collision, went to the scene with fellow employee, David Groves. Barlow testified that they "saw a hole on the edge of the road." It was eight to twelve inches deep. Barlow called a crew to put a barrel over it following the accident. Testifying as to his usual procedure, Barlow testified that "if a pothole was actually in the street, my crews would patch it." A few days after the accident, the city placed asphalt over the hole.
¶ 12. Michael Odom was in the vehicle immediately behind Bowman prior to the accident. Odom testified that he saw the "right front end" of Bowman's truck "nosedive" and stop moving. He explained that the tire went into a hole and the left rear of the truck left the ground, which caused the truck to lose its traction. Cross-examination of Odom revealed that this testimony differed in part from what he had said in his deposition, but he responded that he had simply changed his mind. Odom also testified that his sister had once gotten stuck in the same hole and that the City had compensated her for resulting damages to a wheel.
¶ 13. Claude Ehlers testified to having once driven his vehicle beyond the outer white stripe of the road, near the area where Bowman alleges she fell into a "pothole." Ehlers testified that he was completely beyond the railroad tracks when his car was stuck while he was attempting to make a sharp right turn to get around cars in front of him. Ehlers admitted that had he stayed to the left of the white stripe painted on the roadway and which denoted the lane of travel, he would not have become immobilized.
¶ 14. Pascagoula Police Officer Shannon Broome testified that soon after the accident, he observed water standing in the hole. He notified the traffic division of a "hole" in the pavement. A barrel was *650 placed as a warning, and the barrel was completely off the road. A fair reading of his testimony was that in order to get into the hole, a vehicle would have to leave the roadway. Broome testified that he had regularly observed people driving off the road at the location of the hole in order to enter the right turn lane which began closer to the intersection with Highway 90.
¶ 15. Pascagoula Police Officer Christian Blythe had investigated a previous accident at the crossing. As to the previous accident, Blythe testified that the driver got caught on the tracks themselves and had not told Blythe that his vehicle had fallen into this "hole." A disagreement with counsel was pursued at trial as to whether this was inconsistent with an earlier deposition. Blythe's testimony could be seen as supporting that the other driver got stuck on the tracks, or that he got stuck in the same hole as Bowman. Blythe was also aware of two or three other people who in some fashion had gotten stuck at this railroad crossing, but he did not investigate those events.
¶ 16. Pascagoula Police Officer Erin Dunston was the officer who wrote Bowman's accident report. On the report, Officer Dunston said the cause of Bowman's accident was a "defective shoulder." Dunston admitted that he used the term "defective shoulder" because Bowman told him to use the term. The report also reflected that Bowman had driven off the roadway.
¶ 17. The condition of the roadway is relatively undisputed. Photographs of the tracks and the "hole" were introduced. There was a drop-off on the right side of the roadway about six feet beyond the rails where the street crossed over the tracks. The pavement was fairly high above the ground level as the roadway began its slope down away from the tracks. There was testimony that there were three different applications of asphalt at that location at different times, adding to the elevation difference between the surface of the pavement and the ground to the right. The photographs reveal that small pieces of railroad ties, railroad track ballast, and dirt together formed the surface of what was at the bottom of the drop-off. The right edge of the pavement dropped down at a sharp angle to the ground. The use of the word "hole" or even "pothole" is apt to the extent that at one spot the pavement's edge does not extend to the right as far as the remainder, forming a rectangular cutout at the edge of the pavement that drops off more sharply compared to the pavement that is adjacent to it. The dispute about the accuracy of the word "pothole" may have rested on the fact that there is no pavement completely around this rectangular section, but only on three sides. The defendants employed the word "notch," which we use to aid in the description without giving it a legally significant victory over the plaintiff's preferred "pothole" term.
¶ 18. There was not a painted line at the point of the drop-off to mark the right edge of the roadway. Just at or a few feet beyond the location of the drop-off, though, a painted line begins that extends north to the intersection with Highway 90. For a vehicle to get into the area where the pavement drops off would require it to be well to the right of the beginning of the painted line. There was testimony that to get into the area of the drop-off, a vehicle would have to be three feet to the right of the painted line had it extended all the way to the tracks.
¶ 19. In response to the evidence that she left the roadway, Bowman would have us apply caselaw that when a railroad knows that individuals are commonly crossing its tracks at other than a marked public road, "it has a duty to use ordinary *651 care to maintain a lookout for them . . . ." Carter v. Norfolk & Western Ry., 708 S.W.2d 306, 308 (Mo.App. E.D.1986). Bowman alleges that even if she got off the proper roadway in order to advance over the crossing, she did what the railroad had notice many people did. A similar Mississippi authority is that when notice exists that the public in large numbers continued to use an abandoned street where it crossed their tracks, the railroad owed these individuals "the same duty that it owes to one on the tracks at a public or other crossing, namely, the duty not to negligently kill or injure." Illinois C.R. Co. v. Dillon, 111 Miss. 520, 524, 71 So. 809 (1916). Justice Sykes for the court concluded that such a "case is very different from one where only a few people are in the habit of crossing the railroad track at a certain point not at a public crossing. . . ." Id. Those occasional users of an improper crossing remain trespassers. Id.
¶ 20. We accept that the public's common practices, legal and illegal, negligent and non-negligent, affect the foreseeability to the railroad crew of the hazards of proceeding down a track. It is still a proper view of negligence law that the frequency of the public's wandering off the roadway and becoming immobilized will affect the foreseeability to the railroad.
¶ 21. More in dispute than the condition of the pavement was what Bowman did in response to the oncoming train and just where her truck got hung up on the pavement. The defendants interpret the evidence as supporting that Bowman did not drive off the roadway because of her sighting the oncoming train, but instead simply in negligent haste drove off before the train came into view. The warning devices for oncoming trains at the intersection did not activate until after Bowman had stopped in the middle of the tracks. There is no allegation that the railroad failed to give proper notice of the crossing or of the approaching train. The defendants are correct that substantial evidence existed that Bowman was negligent at least in allowing herself to get blocked on the tracks and perhaps also negligent in how she drove once she stopped atop the tracks. According to statute, a vehicle must be stopped no closer than fifteen feet from the first rail if "required for safety," and "shall not proceed until he can do so safely." Miss.Code Ann. § 77-9-249(4) (Supp.2005). The trial judge refused a peremptory instruction that the plaintiff was negligent, but there is ample evidence that by proceeding onto the tracks before she assured herself that she would not be blocked on them, she violated this statutory standard and was therefore negligent per se.
¶ 22. The controversy below and here is not so much about what happened on the day of the accident but rather who had the responsibility for maintenance of this section of pavement, who did not, and whether there were any defects in the roadway on which to base the liability of a defendant. The one additional theory is that the train crew began to brake later than it should have. After trial, both the city and the railroad were completely exonerated, decisions reached by the trial judge as to the city and by the jury as to the railroad. We will discuss various specific issues regarding the evidence that was admitted or excluded. For the present, we will examine the evidence that was allowed and determine, in light of controlling legal principles, whether the decisions denying liability were significantly out of balance with the weight of that evidence.
¶ 23. The trial court relieved the city of all liability as a matter of law. The city argued and the trial court accepted that by statute, it was the Mississippi Department of Transportation which had the *652 duty to assure the maintenance of this section of road. Miss.Code Ann. § 65-1-175 (Rev.2005). That statute provides that the Department has exclusive jurisdiction with respect to public street crossings of railroad rights of way. That statute does not expressly apply to maintenance of the roadway at the crossing, but instead discusses the authority to allow crossings to be closed and to determine the warning devices at the crossing. The trial judge also concluded that another statute prohibited the city from using its funds on the improvement of railroad rights of way. The statute provides that when "a railroad is constructed so as to cross a highway, and it be necessary to raise or lower the highway, it shall be the duty of the railroad company to make proper and easy grades in the highway so that the railroad may be conveniently crossed." Miss.Code Ann. § 77-9-251 (Rev.2001). The statute by its phrasing appears to apply only to situations in which the street or road predated the railroad. The railroad thereafter must keep the crossings "in good order." Id. The Supreme Court has held that a municipality could not relieve a railroad company of this duty. Mississippi Central R. v. Alexander, 169 Miss. 620, 631, 152 So. 653 (1934). Regardless of this statute's precise applicability to this crossing, it forms a consistent pattern with other authority that it is the railroad that maintains the crossing and not the city.
¶ 24. No party points us to any authority that places a duty on the city to maintain the roadway as it crosses a railroad track. The hazard of entities other than the railroad working in the immediate vicinity of the tracks makes the statutory scheme a common sense approach to the matter.
¶ 25. We interpret these statutes to require the Department of Transportation to oversee that railroads properly maintain the streets that cross their tracks. The city would not have a duty to maintain the crossing. The question that remains is whether the cause of the immobilization of Bowman's truck at this crossing was on the section of Hospital Road that the railroad or someone else was to maintain. The only evidence in the record on that question will be reviewed next.
¶ 26. City employee David Groves identified the portion of Hospital Road that the Department of Transportation maintained. He indicated on photographic exhibits that the railroad paved a very short portion of the street north of its tracks. The Department of Transportation paved the remainder of the street down to the intersection with the highway, had maintenance responsibility for Hospital Road on the opposite side of the intersection for a short distance, and implicitly also maintained Highway 90. This same witness testified that the state directed the city where to paint white lane markings on the road. There is no contrary evidence in the record.
¶ 27. Though the state had the responsibility for significant repairs, city employee Tommy Barlow testified that small repairs would be performed by city crews. After Bowman's accident, the city placed asphalt over the hole. Barlow said that this was done because of Bowman's accident.
Q: It's common for the city just to go around and if it sees a pothole, even if that's upon a state highway, to go ahead and patch it up, isn't it?
A: Not if it's on a state highway.
Q: You call the state and they come in?
A: Yes. The state takes care of their own.
Q: Have you ever done any sort of maintenance in that area before

*653 A: Yes. If a pothole was actually in the street, my crews would patch it.
Q: Would that be south of the highway or north of the highway?
A: On both sides. On both sides of that track. If it's in the street and it's causing a hazard, we will go patch it.
Q: Had the state paved that area prior to you going out there?
A: I don't know who paved it, the approach right there at the track; but the railroad usually does that.
Q: Other than what the railroad had done, the state had always kept that up?
A: Yeah, they upkeep the highway there, the approach.
Q: The city has never paved any of that, have they?
A: Not paved it, but we patched it. We patch regularly.
¶ 28. This is the extent of the evidence regarding the city's potential responsibility. The city at most assumed responsibility for correcting potholes that formed hazardous conditions. There was considerable dispute as to whether the notch or hole was hazardous, and there was also substantial evidence that it was outside the lanes of travel. We are not faced with the legal issue of whether this testimony would have permitted the trial judge to impose liability on the city because of the city's failure to identify the notch or hole as a hazard and to put additional pavement at that location. What does face us is whether it was against the overwhelming weight of the evidence for the trial judge to reject this testimony as a reason to impose liability of the city. It was not. We find no error in the trial judge's conclusion that the city had no liability.
¶ 29. As to the railroad, it definitely had some construction and maintenance responsibility on a small section of Hospital Road in the vicinity of the accident. Kenny Durbin was the CSX engineer in charge of maintenance of the crossings. He testified that CSX contracted for the paving at crossings. Its contractor paved between the tracks and away from the rails only on top of the railroad ties themselves, with a caveat discussed below. The railroad also was required by the Department of Transportation to pave at a width of the actual travel lanes at the crossing. Durbin testified that the pavement placed by the railroad contractor at this grade crossing was wider than Hospital Road, and the photographs reflected that to be the case.
¶ 30. Durbin qualified his statement about the reach of its paving away from the tracks. When new ties were laid, the railroad would cut out the existing pavement in blocks in order to avoid damaging an even larger length of the road. The pavement removal had to extend away from the crossties in order to slide out the old ties and insert new ones. The area north of these rails that was excavated and replaced during railroad tie maintenance was six feet and eight inches. A photograph that Durbin used in his testimony reveals a seam parallel to the tracks that he identified as the place where the pavement laid by the railroad contractor met the pavement laid by the state Department of Transportation. From the photograph, the jury could determine that the northern edge of what the railroad paved is the south side of the notch that the plaintiff alleges was the cause of her vehicle's becoming immobilized, and that the notch was formed in the pavement laid by the state.
¶ 31. Durbin testified that the last time that this crossing had been reworked was in 2001. The Department of Transportation inspects crossings once a year, had seen the notch at least once before the *654 2003 accident, and never informed the railroad that this was a defect. Moreover, the Federal Railroad Administration would have inspected this grade crossing at least once a year and perhaps twice, and it did not indicate that the shape or slope of the pavement was defective.
¶ 32. No Department of Transportation official or employee was called to testify. The applicable regulations are not in evidence and neither party argues them to us. An expert for Bowman testified that the presence of the notch or hole violated the railroad's own standards for a crossing. As noted already, the portion of the railroad that the Bowman expert said violated the railroad's standards was, according to the railroad's evidence, not on the property that they maintained. Therefore, there was a conflict in the evidence for jurors to resolve.
¶ 33. The exact cause of Bowman's becoming stuck at this crossing remained disputed though perhaps the better view supports her theory that her front right wheel fell down into the notch or hole and her truck bottomed out and stalled. The jury had the evidence that the railroad paved up to the edge of that notch, that the feature was outside of the permitted and marked lanes of travel, and that the Mississippi Department of Transportation had responsibility for inspecting the entire crossing and for maintaining the part of the road in which this notch appeared. We therefore cannot find that the weight of the evidence required the jury to impose liability on the railroad.

ISSUE 2. Disqualification of expert witness
¶ 34. Bowman argues that the trial court erred in disqualifying her expert witness, William Gordon. Gordon was offered as an expert in event recorders. He would have read and interpreted documents produced by a data recorder that indicated the distance before impact when the train began to apply its brakes. CSX objected because Gordon had no previous experience with interpreting data recorders. Gordon testified in his deposition that he had not had any training in the interpretation of the particular data tables about which he was being offered to testify. Gordon also said of the data tables, "[t]he information on these are self-evident. You don't have to be a rocket scientist to interpret one of these." Gordon's work history included significant experience in the regulation of the rail industry. However, he was not being called as an expert on anything other than interpretation of the data recorders, about which he admitted not being expert.
¶ 35. A witness may testify as an expert if "qualified by virtue of his or her knowledge, skill, experience or education," but only if "the witness's scientific, technical or other specialized knowledge [will] assist the trier of fact in understanding or deciding a fact in issue." M.R.E. 702. The trial judge has the gate-keeper function of determining that "the witness is indeed qualified to speak an opinion on a matter within a purported field of knowledge." M.R.E. 702, cmt.
¶ 36. Gordon did not possess any knowledge, skill, experience, or education in the interpretation of the data tables produced by the machinery in question. Accordingly, his testimony would not have assisted the trier of fact. In addition, Gordon himself admitted that the interpretation of data, for which Gordon was offered as an expert, was "self evident."
¶ 37. The trial court did not abuse its discretion in excluding the witness.

Issue 3: Exclusion of prior accidents at the railroad crossing as impeachment
¶ 38. The trial court excluded testimony about three wrecks at this same *655 railroad crossing since 1990. When asked by the court if Bowman had any reports that "approximated" the Bowman accident, counsel replied, "I have the Bryan Williams, Your Honor." The trial court allowed the Williams accident to be explored but excluded the remainder. Other events must be substantially similar to the incident in question before evidence of them becomes relevant. Parmes v. Illinois Cent. Gulf R.R., 440 So.2d 261, 265 (Miss. 1983). The court committed no error in excluding the reports of the three dissimilar events and allowing testimony only as to a fourth.
¶ 39. Perhaps acknowledging the issue of dissimilarity, Bowman principally argues that evidence of all other accident should have been admitted as impeachment because a CSX witness had denied knowledge of other accidents at that location. The witness further said that he would have gotten reports of any accidents that had occurred. Bowman's attorney then sought to question the witness about accidents in 1990 and 1991 to impeach the witness about his denial of knowledge. It is true that evidence otherwise inadmissible can be allowed if a party against whom the evidence is to be used has waived objection in some fashion. Blake v. Clein, 903 So.2d 710, 726 (Miss.2005) (patient's introduction of unredacted medical records waives medical privilege that otherwise would apply). Even if the door for admission is opened by a party, though, the offered evidence must still be relevant. Relevance is the most basic of the requirements no matter what other evidentiary rules may have been waived. M.R.E. 401. The trial judge had discretion to determine that impeachment of this witness did not require a review of the details of the other accidents at the crossing.
¶ 40. Bowman's arguments concerning the negligence of the defendant very much focus on the condition of this roadway on the date of the accident in 2003. Unless proof to the contrary is given as a predicate, events ten years earlier surely are irrelevant in a dispute such as this. The defendants did not open the door to irrelevant evidence.

Issue 4: CSX counsel's remarks regarding witness Michael Odom
¶ 41. Bowman alleges that counsel for CSX made prejudicial statements regarding the testimony of Michael Odom, by suggesting that the witness had been "coached to be untruthful." Odom had referred in his deposition to Bowman's tire spinning on a crosstie. There were no exposed wooden crossties at this crossing, since the surface was paved with asphalt. In his direct testimony at trial, Odom no longer made that mistake. Cross-examination included this exchange:
Q: Did someone call your attention to the fact that you had testified about the wooden crossties in your deposition before you came here today?
A: When I talked to you the other day on the phone and you asked me about that, and that's why I went by there this morning to look.
Q: Nobody else brought it to your attention?
A: No, sir.
Counsel for CSX read the portions of Odom's deposition that had referred to crossties.
¶ 42. Bowman also takes issue with part of the CSX closing argument: "But this one [crossing] didn't have boards, so he said I thought it was like some other crosstie, and I said, well, when did you look at photographs. Well, outside. I talked with the lawyer."
¶ 43. There was no objection made to either set of statements at trial. We find nothing particularly prejudicial about *656 them. A trial judge is in the best position to determine whether a remark has had prejudicial effect. Dorrough v. Wilkes, 817 So.2d 567, 576 (Miss.2002). If no objection was made at trial, the court could not rule. This assignment of error is rejected.

Issue 5: Testimony of CSX's expert Burdick
¶ 44. CSX offered Dr. Glenn Burdick as an expert in physics, accident reconstruction, photometrics, light and sound and optics, dynamics of automobile and train braking and stopping, event recorders on trains, and railroad crossing standards and construction. Bowman objected to Burdick's testimony because he was not offered as an expert in the field of grade crossings. Initially, the Court refused to let Burdick testify with respect to grade crossings. The Court changed its ruling upon clarification by CSX counsel as to the specifics of Burdick's testimony. Burdick's curriculum vitae reveals that he was the long-time dean of engineering at the University of South Florida, with decades of engineering experiences, both as a professional engineer and professor. Moreover, he held a PhD in physics from the Massachusetts Institute of Technology and possessed teaching experience in a number of subjects relevant to his testimony.
¶ 45. Bowman argues that the court erred in allowing Burdick's testimony because he had never taught a class in crossing design, and had never taken a course in crossing design, yet changed his testimony to state that he had taught such courses. Also, Bowman alleges that the court let Burdick testify simply because he had allowed Bowman's civil engineering expert Harris to testify.
¶ 46. This was the relevant discussion of the acceptance of Burdick:
MS. BERTUCCI (plaintiff's counsel): Your honor, I thought my question to him was, had he ever been asked to consult on designing or maintaining the grade crossings. My understanding of the Court's ruling was that it covered the grade crossing, and whether it was reasonable, that particular opinion in their designation.
THE COURT: And I think as I remember it, when you asked him, I believe Dr. Burdick said that he had never taught any classes on grade crossing, nor had he designed any, as I understood it.
BURDICK: I probably said it poorly. It's come up as topics in courses, but the course was not entitled as that. I taught forensic engineering, which included 
THE COURT: I'm sorry?
BURDICK: I taught a course called Forensic Engineering, and that included grade crossings, and grade-crossing safety; but I never taught a single course entitled Grade Crossing 101.
THE COURT: Probably because one doesn't exist, I would suspect.
MR. BUCHANAN (CSX counsel): And as to what Ms. Bertucci said, I mean, I asked that exact same question to Mr. Harris who was qualified, and actually in the transcript I said, you have no experience with the maintenance of railroad grade crossings, isn't that true, and Mr. Harris responded, yes, that's true, but was allowed, because he was a civil engineer, as I understood it, to testify relative to this condition.
MS. BERTUCCI: Your Honor, Mr. Harris testified relative to this condition as it pertains to roads in general. The Court ruled, and he did not testify about the specifics of a railroad crossing. He said he didn't know what the standards were, and he testified to what the standards are for a road in general. The *657 roadway, what it's comprised of, those sorts of things; not as it relates to a railroad crossing.
THE COURT: Mr. Harris said he didn't know the standards, did he not?
MR. BUCHANAN: Yes, sir.
¶ 47. The Court stated that since he let Harris testify with similar credentials, he would permit Burdick to do so. There was no suspicious change in the expert's characterization of his own credentials, and we find no error in the acceptance of his expertise.

Issue 6: Declarations by employees against party's interest
¶ 48. The court refused to allow testimony from Officer Shannon Broome about a conversation that he had on the day after the accident with an individual in the city's traffic division. Broome testified that he was told that there had been another incident involving that same hole. After Broome made that statement, the city's attorney objected to any further testimony as being hearsay. Bowman's counsel argued that the statement by a city employee was a declaration against the city's interest and was admissible. M.R.E. 801(d)(2)(D). The trial court disallowed further testimony.
¶ 49. Another witness, Julian Richard, testified that he had told CSX employees about the existence of a hole and the need to fix it. The trial court sustained a hearsay objection to what the CSX employee's response to Richards had been.
¶ 50. The objection to Broome's testimony was that relying on the counsel's recollection of the matter from earlier, the attorney believed that what Broome had been told was actually "double hearsay." There was no proffer of the testimony that was the subject of the hearsay objection either when Broome was the witness or when Julian Richard testified. However, Richard in response to a later question said that he was told by a CSX worker that the "notch" or "pothole" was necessary for drainage. The court informed the jury that they should disregard that testimony. That was an accidental proffer, but it notifies us all the same of the excluded evidence.
¶ 51. Bowman relies on a precedent involving a nurse's claim that she was wrongfully discharged to support the admissibility of representative or vicarious statements against interest. Levens v. Campbell, 733 So.2d 753 (Miss.1999). A nurse named Diane Smith, employed by the defendant hospital, gave an affidavit that she had been told by the director of the nursing department, Amy Sheffield, that the hospital's chief operating officer Cindy Campbell told Sheffield that she did not want the plaintiff working at the hospital. The court held that Campbell's statement to Sheffield was not admissible through nurse Smith's affidavit as a "statement by a [defendant's] agent or servant concerning a matter within the scope of his agency or employment, made during the existence of the relationship." Id. at 758; M.R.E. 801(d)(2)(D). The court said that since "the statement by Smith as to Cindy Campbell is offered to prove Cindy Campbell told Amy Sheffield she did not want [plaintiff] Anne Levens working in the hospital, which Levens asserts led to her not being hired, this portion of the affidavit does constitute inadmissible hearsay." Levens, 733 So.2d at 758. What was admissible was Sheffield's separate statement to the affiant Smith that Sheffield had been directed by assistant hospital administrator Faye Anderson to tell Levens falsely that there was a hiring freeze at the hospital. Levens, 733 So.2d at 758.
¶ 52. The Levens court may have refused to allow the statements concerning Campbell's personal desires because they *658 were not statements on behalf of the employer. It allowed the statement of official hospital position reflected in the Anderson directive about a hiring freeze. In neither situation did the Supreme Court indicate a concern about the layers of hearsay involved. The affiant Smith had not been the initial person who heard the statements.
¶ 53. We find that the trial judge in our case was somewhat cursory in his analysis of whether these two statements were not hearsay because of their being made by employees of the two parties. Broome's evidence would have been that the city may have been aware of other incidents at this location. Richard's testimony would have been that CSX had an explanation for why the pavement was shaped the way that it was at this location, namely to assist drainage.
¶ 54. Even if further exploration of the potential testimony would reveal that one or both were admissible as being a non-hearsay admission by a party-opponent, we must look for whether there was reversible error. No party is entitled to a perfect trial but may insist on one free from error that with some degree of likelihood affected the outcome. Only if a substantial right is affected do errors in evidentiary rulings require reversal. M.R.E. 103. Further, only if a proffer is made of evidence that otherwise does not appear in the record will reversal be possible. M.R.E. 103(a)(2).
¶ 55. We have discussed the fact that evidence of one other accident at this location was admitted, while evidence of three other incidents were excluded because they were not shown to be sufficiently similar. We do not know whether the traffic division employee's statement concerned a substantially similar or dissimilar incident. Perhaps it concerned one of the four incidents that were evaluated in the preceding issue. Evidence of one other problem at this location was presented to the jury. The Broome testimony might have allowed the exploration of a second similar incident. That makes the evidence merely cumulative. Particularly absent a proffer, there is no reversible error.
¶ 56. On the Richard testimony, if a CSX employee had given an admissible explanation that the shape of the pavement at this location was due to the requirements for drainage, we do not find that would have been beneficial to the plaintiff. It also was cumulative of the more detailed treatment of the issue by the railroad witness Durbin, who addressed the need for a slope at this location to facilitate drainage and avoid the danger of creating a situation for hydroplaning. The statement also would have supported that CSX had knowledge of the condition of the pavement at that crossing. A review of the record does not indicate that CSX's knowledge of the condition of the crossing was a critical point in the plaintiff's case at trial. Bowman argues that in its answer, the railroad gave a general denial that would have applied to the issue of knowledge as well. What is important in the evidentiary ruling, though, is whether notice was contested at trial. It was not. Liability turned on whether it was negligence to allow this drop-off, notch, or pothole to exist. At trial, CSX did not deny knowledge of the condition but argued that the roadway was not defective. The issue of whether the railroad had negligently failed to comply with its obligations to maintain the crossing would have been unaffected by the challenged evidence. We find no reversible error in excluding the two potentially nonhearsay statements.

Issue 7: Bryan Williams's testimony
¶ 57. Bryan Williams testified about a 2002 accident that he had at this same location. It was his accident that *659 was found to be substantially similar to Bowman's, which allowed Bowman to call the investigating officer in order to explore the events. CSX called Williams in presenting its case.
¶ 58. Williams testified that just before his accident, he had crossed the same tracks and the car in front of him stopped suddenly. He became stuck on the train track. Williams then heard a train in the distance and veered to his extreme right to get off the track. When he did so, Williams testified that he "ran out of pavement." Williams and his son exited the automobile. A few minutes later, Williams's car was struck by a train. He was asked whether he blamed the city or the railroad for the accident. Bowman objected, arguing that Williams' opinion about fault was irrelevant and highly prejudicial. Her objection was overruled, the trial judge saying that Bowman had "tied these cases together" and would have to accept the testimony. Williams testified that he did not blame the defendants, but he believed "it was my fault."
¶ 59. We agree with the trial court that Bowman's own effort to prove the Williams' accident was similar to her own made his testimony about the details of the accident relevant. That seemed to be the sole basis for the trial judge's ruling about the opinion on fault. Relevance of the factual details about the accident, though, does not resolve the relevance of Williams' opinion about the fault. For example, absent unusual factors, no witness testifying about the facts of Bowman's accident would have been allowed to answer a question of whether Bowman was solely at fault.
¶ 60. To decide whether error existed, we start with the principle that "an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." M.R.E. 704. Still, an "absolute requirement" for the admissibility of an opinion is that it be helpful to the fact-finder. M.R.E. 704, cmt.
¶ 61. Williams would not qualify, and indeed was neither offered nor accepted, as an expert on the dynamics of accidents at this crossing. At best he was a lay witness whose opinions are "(a) rationally based on the perceptions of the witness [and] (b) helpful to the clear understanding of the testimony or the determination of a fact in issue . . . ." M.R.E. 701.
¶ 62. Williams gave his opinion as to fault in his own accident. He did not give an opinion as to fault in Bowman's accident, though Bowman is not engaged in excessive speculation to allege that the natural and intended effect of the opinion was for it to be transformed in the jurors' minds into an opinion about Bowman's accident. We can accept that the factual part of this opinion was rationally based on Williams' perceptions. However, negligence is a mixed question of law and fact. Kennedy v. Reed, 393 So.2d 480, 483 (Miss. 1981). Responsibility for a tort requires duty, breach of duty, proximate cause, and damages. Burnham v. Tabb, 508 So.2d 1072, 1074 (Miss.1987). Williams was not competent to address the legal components of fault necessary for an opinion. The key question in Bowman's case is whether despite her own negligence, there was fault for others to share that explained the accident. We also do not find that Williams' opinion was helpful to the fact-finder. On both counts, the opinion should have been excluded from evidence.
¶ 63. Williams perhaps laudably expressed his sense of guilt at driving in a way that in hindsight he considered to be negligent. We also accept that jurors reasonably would have received the opinion in that way, as an admission that he had *660 driven foolishly. Williams was not presented as an expert in law or in accident reconstruction. Williams admitted the obvious in saying that he was negligent in getting on the railroad tracks without first assuring that he would not get blocked there by traffic ahead of him. It is unclear whether Williams was saying that he felt himself solely responsible for his own accident. Sole compared to shared fault was the central issue for jurors as to Bowman's accident. Putting the opinion in the proper perspective was the task for Bowman's counsel. We do not find that Williams' mis-statement would have seriously impacted deliberations on whether the notch or hole was negligently allowed to exist and made the railroad at fault too. This inappropriate lay opinion did not affect a substantial right and was not reversible error. M.R.E. 104.

Issue 8: Jury Instructions D-2, D-4, D-6(a), D-7(a) and D-9(b)
¶ 64. Bowman argues that certain of the defendant's jury instructions were inaccurate statements of the law. Jury instructions are considered as a whole. Burr v. Mississippi Baptist Med. Center, 909 So.2d 721, 726 (Miss.2005). One instruction's incompleteness does not lead to reversal, where the whole of the instructions presents an adequate statement of the law with proper evidentiary foundation. Burton ex rel. Bradford v. Barnett, 615 So.2d 580, 583 (Miss.1993).
¶ 65. We will address Bowman's complaints about each instruction.
D-2. The Court instructs the Jury that the railroad is not required, under the law, to maintain a crossing at which no accident is possible, but is required only to exercise reasonable care so as to maintain a public crossing which is reasonably safe for use by persons who, in such use, exercise reasonable care.
D-6(a). The Court instructs the Jury that if you find from the evidence that the railroad crossing was reasonably safe for vehicles which are operated in a reasonably safe manner by drivers exercising ordinary care, then you should return a verdict for the Defendant, CSX Transportation, Inc.
¶ 66. Both instructions are a correct statement of the responsibility of the owner of property on which people are invited to enter. Anderson v. B.H. Acquisition, Inc., 771 So.2d 914, 918 (Miss.2000.) Even so, Bowman alleges that these instructions override comparative negligence in that even if she had not been exercising reasonable care, the railroad is not absolved from all liability if it negligently contributed to the accident in some manner. She quotes from a precedent involving railroads that even when a plaintiff has been negligent, "it does not necessarily follow that there can be no liability to a person who was not exercising care." Alabama & V. Ry. Co. v. Graham, 171 Miss. 695, 157 So. 241, 246 (1934). For example, if a railroad failed to keep a bridge "reasonably safe for persons using ordinary care," it too could be partly liable despite the negligence of others. Id.
¶ 67. Accepting this point, we disagree that either contested instruction undermined this legal principle. That Bowman's negligence would not exonerate the railroad if it negligently contributed to her injuries was explained in another instruction, which provided for assigning percentages of fault. Reading the instructions as a whole, the jury would have understood that Bowman's negligence would not free the railroad from responsibility if it also was negligent.
¶ 68. Bowman also complains that instruction D-2 was abstract, meaning of course that it did not apply the specific facts of the case to the legal standard. That argument was not made to the trial *661 court and therefore is not preserved for review here. Had there been a likelihood that this instruction would be misunderstood because of its generic nature, which we do not observe, a timely objection could have led to useful additions to the language.
D-4. The Court instructs the Jury that those in charge of the CSX Transportation train had the legal right to assume that the vehicle which Jewel L. Bowman was driving would either stop and yield the right-of-way in compliance with Mississippi Law as set forth in other instructions, or move off the rails beyond the path of the train, and allow the train to proceed over the crossing, and they had a right to indulge in that assumption until and unless it became or should have become reasonably apparent to them in the exercise of reasonable care that she was not going to do so.
¶ 69. As to this instruction, Bowman complains that it fails to take into account that the railroad should have known that other vehicles had been unable to get out of the way of trains because they too had become immobilized due to the notch/pothole. The premise of Bowman's argument is that this crossing was so inherently dangerous that whenever an approaching train crew saw that a motorist had violated the traffic law by stopping on the crossing, the crew from that fact alone should have anticipated that the vehicle would not be able to move off in time. The evidence that some prior vehicles had become stuck at this crossing did not reveal such frequency of problems as to the create a rule that the mere presence of a vehicle on the crossing created an obligation on the part of a railroad train crew immediately to start slowing down. The instruction was phrased in a manner to allow Bowman to argue to jurors the facts that in her view should have caused this train to start slowing. Indeed, the crew saw her truck on the tracks and from that alone knew that a vehicle would potentially still be astride the tracks when the train got to the crossing.
¶ 70. A different instruction that was given to jurors raised this same issue in a manner that would have allowed a verdict for the plaintiff. Part of instruction P-11(a) stated that if jurors found
that CSX had a duty to repair the hole or notch in which Ms. Bowman got stuck, and that CSX employees knew or in the exercise of reasonable care under the circumstances should have known of the condition but failed to inform the subject train operators or other responsible CSX employees of its existence, and you find that such hole or notch was a dangerous condition which caused or contributed to the Plaintiff, Jewell Bowman's accident, then you may find that this omission to warn them of its existence was negligence.
¶ 71. With the degree of discretion that a trial judge has to assure that the entirety of instructions present all the relevant legal principles, there was no error in allowing instruction D-4.
D-7(a). The Court instructs the Jury that if you find, from a preponderance of the evidence, that the Plaintiff, Jewel L. Bowman, was negligent when she caused her vehicle to become stuck or immobile in the path of the train, when she drove her vehicle beyond and outside the proper travel lanes of the street, where vehicles are not intended to travel; and
If you further find, from a preponderance of the evidence, that such negligence, if any, was the sole proximate cause of her accident, then you should return a verdict for the Defendant, CSX Transportation, Inc.
¶ 72. This instruction requires a verdict for the railroad if jurors found that *662 Bowman's actions were the sole proximate cause of the accident. It allowed jurors to find her negligent in her actions, including driving off the roadway where her vehicle should not have been. Those were fact questions that, if answered in a certain manner by the jurors, would absolve the railroad from liability. By statute, it is proper to submit to the jury the issue of the sole proximate cause of a railroad crossing accident. Miss.Code Ann. § 77-9-249(3) (Supp.2005). Bowman alleges that her driving off the travel lanes was not negligent because a witness testified that a "shoulder" was proper to be used in emergencies. That testimony was usable by the jurors, consistent with the guidance in this challenged instruction, to excuse her conduct. Conversely, jurors could have concluded that she was negligent because she initially allowed herself to get blocked onto the tracks and then drove onto what jurors could decide from the photographs was not a "shoulder" for use during emergencies.
¶ 73. Instruction D-7(a) was not erroneous.
D-9(b) The railroad is responsible for the installation and maintenance, at its crossings, of signs know[n] as "railroad crossbucks." The installation and maintenance of all other warning signs and pavement markings at railroad crossings is the responsibility of the entity that owns the roadway.
The Court instructs the Jury that you may not return a verdict against the Defendant, CSX Transportation, Inc., for the installation and maintenance of the warning signs and pavement markings at the Hospital Road grade crossing.
¶ 74. Bowman's claim as to D-9(b) reduces to the point that it was unnecessary. She did not argue that there was any defect arising from the warning signs or pavement markings. The railroad wanted to be certain that the jurors did not stray into an area of potential liability that was not raised factually nor by argument. It might have been appropriate for the trial judge to deny this instruction. We do not find it to be confusing, though, or otherwise prone to skew juror deliberations on the contested issues. The granting of D-9(b) is not grounds for reversal.

Issue 9: Whether the court erred in refusing Jury Instructions P-2, P-4, and P-5
¶ 75. Bowman argues that the following instructions should have been granted.
P-2. Negligence is the failure to use reasonable care.
Reasonable care is that degree of care which a reasonably careful person would use under like or similar circumstances. Negligence may consist either in doing something that a reasonably careful person would not do under like or similar circumstances, or in failing to do something that a reasonably careful person or company would do under like or similar circumstances.
In this case, the Defendant CSX Transportation, Inc. was required to take such measures as were reasonable under the circumstances and, if you find from a preponderance or greater weight of the evidence that its failure to repair the hole or rut in which Ms. Bowman's pick-up truck stalled was a failure to do that which a reasonably careful person or company would do under the circumstances and that such failure proximately caused or proximately contributed to the train wreck and to Ms. Bowman, then you shall find for Jewell L. Bowman against the Defendant, CSX TRANSPORTATION, INC.
*663 ¶ 76. The discussion of this instruction at trial focused on whether a description of "reasonable care" appeared in another of Bowman's instructions. It does. Counsel argued that this instruction was different, but her only explanation was to say that she wanted P-2 in order to have a "negligence definition." Examining plaintiff's instruction P-11(a), we find it to be similar and to cover all the points made by the rejected P-2. The question of whether the railroad had a responsibility for the notch or hole was presented, and even beyond what the rejected P-2 stated, it put the negligence in terms of the railroad's possible failure to warn its train crews of the condition and the likelihood that it could cause motorists to be stuck. There was no error in rejecting a duplicative instruction.
P-4. The operator of a train is under a duty to persons crossing or attempting to cross a railroad track at a public crossing, to exercise reasonable care, that is, the care that a reasonably prudent operator of a train would exercise under the same or similar circumstances.
If you find from a preponderance or greater weight of the evidence that the operator of the CSX Transportation, Inc.'s train failed to exercise reasonable care in order to stop the train before it struck Ms. Bowman's pick-up truck, and that this failure proximately caused or contributed to Ms. Bowman's injuries, then you shall find for the Plaintiff, Jewel L. Bowman, against the Defendant, CSX Transportation, Inc.
¶ 77. This refused instruction raised the issue of negligence on the part of the train crew in failing to engage its brakes earlier than it did. The instruction was denied because there was no evidence on which jurors could rely to determine that the train crew should have begun to slow earlier. Bowman all but admits that evidentiary defect but states that had her expert Gordon been allowed to testify as to the data recorders, he could have presented evidence as to how much sooner the train should have been braked. Still, we find nothing to undermine our earlier analysis that Gordon was not presented as having the credentials to testify on such matters.
¶ 78. As noted above, the need to warn the train crew that there were continuing problems at the crossing with a notch or hole and therefore to be more wary of cars astride the crossing was presented to the jury in instruction P-11(a). Based on the evidence, we find no reversible error in failing to give a general instruction about the need to brake earlier than the crew did.
P-5. If you find from a preponderance or greater weight of the evidence in this case that:
1. The Defendant, CSX TRANSPORTATION, INC., was a railroad company operating a train upon the tracks in the state of Mississippi; and
2. The operator of the train which struck Ms. Bowman's truck knew or should have known of the presence of Ms. Bowman's truck extending upon the track; and
3. The CSX operator of the train failed to take reasonable action under the circumstances; and
4. The CSX operator of the train's failure to take such reasonable action was a proximate contributing cause of Ms. Bowman's injuries;
then you shall find for the Plaintiff, JEWEL L. BOWMAN.
¶ 79. This instruction overlaps the previously discussed rejected instruction. In a more generic way, it states that the train crew should have begun braking sooner  there was nothing else argued that the *664 train crew could have done. For the same reason as our upholding the refusal to grant P-4, we accept that this final challenged instruction was properly refused.

Issue 10: Refused testimony about drivers' frequent use of off-road pavement
¶ 80. Michael Odom testified to being behind Bowman when she had her collision. On redirect, Bowman's counsel wanted to ask him whether he had seen other motorists as a routine practice getting onto the part of the pavement in which the notch was located. The railroad's counsel objected as not being proper redirect. The trial judge found the questioning to be outside the scope of the cross-examination and refused to allow it.
¶ 81. Bowman argues that what allowed this questioning was the need to alert jurors that driving onto the location of this notch was often necessary even though that would place them outside the painted lines marking the roadway's edge. What Bowman does not argue to us is that this witness had been questioned on the matter on cross-examination. Without determining whether we agree that the testimony was particularly important, we conclude that the orderly presentation of evidence is to be managed within the broad discretion of the trial judge. Though the trial judge has discretion, redirect examination should generally be limited to matters brought out during cross-examination. Hughes v. State, 735 So.2d 238, 264 (Miss.1999).
¶ 82. The trial judge did not abuse his discretion here.

Conclusion
¶ 83. There was meaningful evidence in this case that Jewell Bowman negligently drove onto the railroad tracks without first assuring herself that the traffic in front would allow her to clear the tracks. It is also reasonably likely that after committing that act of perhaps common negligence for drivers at this crossing, either out of impatience prior to the sighting of the train or once becoming aware of a train's approach, she maneuvered her truck outside the legal lanes of travel and into a hole or notch that caused two of her tires to lose contact with the roadway.
¶ 84. The evidence also supports that the City of Pascagoula had no responsibility for maintaining that portion of Hospital Road. A city crew made a repair to the road a few days after the accident, but the willingness to repair does not mandate a jury finding of liability for failing to repair sooner.
¶ 85. It is reasonable to interpret the evidence as proving that the hole or notch created a hazard for drivers reacting to their earlier mistakes in getting blocked on the tracks while a train was advancing menacingly, or in making hasty decisions to move ahead to the intersection around traffic without the threat of an oncoming train. What is more disputed is whether allowing such a hazard to continue, if it is off the roadway, is negligence. If it is negligence, it was also factually disputed whether the railroad as opposed to the Mississippi Department of Transportation (who is not a party to this suit) was responsible for taking corrective action.
¶ 86. The evidence also supports that the railroad was aware of the hole or notch. The evidence supports that the notch was beyond the section of roadway that the railroad had the obligation to maintain and instead was the responsibility of the Mississippi Department of Transportation.
¶ 87. Properly directed by the instructions that were given and not impeded in the accuracy of their deliberations by any instruction refused the plaintiff, the jurors reached a verdict that is supported by the *665 evidence. Similarly, the trial judge made findings and conclusions regarding the city that are sustainable in law and fact. We find no basis to disturb the judgment.
¶ 88. THE JUDGMENT OF THE JACKSON COUNTY CIRCUIT COURT IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
KING, C.J., LEE AND MYERS, P.JJ., IRVING, CHANDLER, GRIFFIS, BARNES, ISHEE AND ROBERTS, JJ., CONCUR.